East Tenn., Va. & Ga. Railway Company v. Kane.

| 92 | 187 |
|----|-----|
| 94 | 110 |
| 92 | 187 |
| 102 | 338 |
| 92 | 187 |
| 107 | 76 |
| 92 | 187 |
| 110 | 247 |
| 92 | 187 |
| 114 | 371 |
| 92 | 187 |
| 116 | 17 |

1. Where a non-resident witness for whom interrogatories had been sued out was in court at the time of the trial, it was error to permit the answers to the interrogatories to be read to the jury over objection of the opposite party, although the witness was in attendance upon the court at the instance of the latter, the witness being actually present when the answers to the interrogatories were offered in evidence.

2. It is not cause for a new trial that the court refused to allow certain questions propounded to witnesses by defendant's counsel to be answered, it not appearing what answers were expected, and, in view of other evidence and of admissions in the declaration, no possible answers to these questions being substantially material.

3. Upon the trial of an action against a railroad company for a homicide resulting in part from the misplacement of a switch, it was not error to refuse to allow the defendant to show " the common experience of railroads " in getting back switch-keys from their

employees, and that all railroads have great difficulty in keeping up with such keys and having them returned by discharged employees because of their real or alleged loss.  Nor was there error in refusing to allow defendant to prove "the custom or usage of railroads in reference to providing a watchman for each of their switches," defendant expecting to prove "that the general custom was not to provide a watchman for such switches."

4. Though one of the main issues was whether or not the engineer for whose homicide the action was brought was guilty of negligence in bringing about the collision which resulted in his death, there was no error in refusing to allow the defendant to prove that he "was habitually reckless in running freight-trains at excessive speed, and running too fast over switches," the witness's knowledge not extending to more than two or three instances.

5. The defendant may invoke and use allegations beneficial to himself made in plaintiff's declaration, without offering the declaration itself in evidence or otherwise proving the admissions contained in such allegations, and no unfavorable inference can properly be drawn against a corporation because of a failure to call as witnesses its own employees to prove the existence of facts shown by such admissions.

6. The mere fact that a railroad company fails to recover from a discharged employee a key which controls the turning of a switch, is not of itself sufficient to make the company liable for the criminal act of such employee in maliciously misplacing a switch for the purpose of wrecking a train.   The company is not bound to anticipate that, purely out of revenge for his discharge, a former employee might secretly commit so heinous a crime against it and the public.   Nor is the company bound to exercise constant vigilance to prevent all persons whatsoever not in its employ from having the means or opportunity of tampering with its switches or its tracks.   Whether or not in any particular case the company exercised the proper degree of care in protecting its switches from interference, is a question for the jury, in determining which they may look to the evidence to ascertain if there was any reason for the company to apprehend such interference, and if so, whether, under all the circumstances, it used due diligence in endeavoring to prevent the same.   In its charge to the jury, the court should not state or assume that a given state of facts would show negligence on the part of the company in the respect indicated.

7. A *prima facie* case of negligence on the part of the defendant, which the plaintiff's declaration covers, cannot be effectually answered by a given state of facts, if those facts involve a breach of diligence by the defendant in a material respect; and such breach of diligence, if shown, may be urged by the plaintiff, not to recover upon, but to defeat the defendant's justification, although no reference to it is made in the plaintiff's pleadings.

8. According to the undisputed facts, the plaintiff's husband was guilty of negligence in running his train in violation of the rules of the company, of which he had knowledge, and which he had agreed, upon entering its employment, to obey. For this reason, and because of errors committed by the court, there should be a new trial; and if, upon the next hearing, the evidence is substantially the same, there should be a verdict for the defendant.
June 26, 1893.

Action for damages. Before Judge Ross. City court of Macon. September term, 1892.

HILL, HARRIS & BIRCH, for plaintiff in error.

LANIER, ANDERSON & ANDERSON, *contra*.

LUMPKIN, Justice.

1. Section 3878 of the code declares that if the state of facts on which a commission to take interrogatories issued ceases to exist before the trial of the cause, and the witness is then accessible by *subpœna*, the testimony taken on interrogatories cannot be used. It follows, necessarily, that if the witness is accessible by being actually present in court at the trial when his testimony by interrogatories is offered, his answers to the same cannot be admitted, but the witness should be examined in person. It does not make the slightest difference that his attendance upon the court was at the instance and request of the opposite party. If, because of this fact, the party who had caused the interrogatories to be sued out does not desire to introduce the witness, it is his right to decline to do so; but if he wishes the testimony of the witness to go before the jury, he must put the witness on the stand. Testimony taken by interrogatories is, at best, unsatisfactory and imperfect, and it is the policy of the law to dispense with this method of securing evidence whenever practicable. Of course, if answers to interrogatories have already been read to the jury, and the witness afterwards comes into court, this would not require that the answers be ruled out or withdrawn. Nor must anything here said be

construed to prevent the introduction of answers to interrogatories for the purpose of impeaching a witness when his testimony on the stand is in conflict with that which had been taken by commission. Nor is the rule announced applicable to female witnesses, for they enjoy at least a qualified privilege as to attending court.

2. The evidence showed that a violent collision had taken place between the engine which the plaintiff's husband was running as engineer, and certain box-cars which were standing upon a side-track. The wreck resulting from this collision was of such character that there could be no possible doubt the engine must have been running at a very rapid rate of speed. Counsel for the railway company elicited from certain witnesses a full description of the wreck and its consequences, and then asked of each "whether or not a collision of that violence could have taken place unless the engine had been running at a very high rate of speed." Upon objection by plaintiff's -counsel, the court refused to allow these questions to be answered; and although it was not stated by counsel propounding the questions what answers were expected, the court, perhaps, ought to have permitted the answers to go to the jury. It being manifest, however, that the engine was running very rapidly, and the plaintiff's declaration admitting this fact, the refusal of the court to allow the questions to be answered would certainly be no cause for a new trial.

3. The defendant desired to show "the common experience of railroads" in getting back switch-keys from their employees, and in this connection, to prove that all railroads have great difficulty in keeping up with such keys and recovering them from discharged employees. It also sought to prove "the custom or usage of railroads in reference to providing a watchman for each of their switches," and "that the general custom

was not to provide a watchman for such switches." The court rejected all of this testimony, and in our opinion, did so properly. Testimony as to the common experience, customs or usages of railroads, without reference to whether they are wisely or badly managed, or to their particular location or surroundings, or to peculiar circumstances which in any given instance would tend to illustrate the diligence or negligence of a company in recovering or failing to recover its switch-keys, or in guarding or failing to guard its switches, would be too vague, uncertain and indefinite to aid a jury in determining in a case on trial whether or not the railroad company was diligent or negligent in these respects. No two cases are exactly alike, and the facts and circumstances in each being different in greater or less degree from those arising in others, the better and safer rule is to allow the jury, as to questions of the kind presented, to determine every case upon its own individual merits and in the light of its own particular facts. In some cases the failure to recover a switch-key, or to have a switch guarded, might involve little or no negligence whatever. In other cases, such failure might amount to very gross negligence. This being so, to permit evidence as to the common experience and general custom of railroads in such matters, would probably be misleading, and certainly could have little weight in a given case in arriving at a fair and just conclusion upon the question of negligence.

4. The main defence relied upon was, that the engineer for whose homicide the action was brought was himself guilty of negligence in bringing about the collision which resulted in his death, by running his engine at too great a speed, and in violation of the company's rules. In support of this defence, the defendant offered to prove by one McCrary that the deceased was habitually reckless in running freight-trains at excessive

speed, and in running too fast over switches. It appeared from McCrary's testimony that he had been conductor of a freight-train on defendant's road between Macon and Brunswick on which Kane was engineer, and that Kane had pulled him two or three times on a local freight. Under these circumstances McCrary could hardly swear with accuracy to the *habitual* recklessness of the deceased. The admissibility of testimony of this kind is, at best, very doubtful. While in *Savannah, Florida & Western Railway Company* v. *Flannagan*, 82 *Ga.* 579, this court held that it was not error to receive evidence showing the high speed at which *the same engine* was habitually run by *the same engineer* at *the same place*, and that he habitually neglected to ring the bell, Chief Justice Bleckley, on pages 588–9, characterized this evidence as being of doubtful admissibility, and stated that the authorities upon the question were in conflict, citing quite a number on both sides. The testimony offered in the case at bar is by no means so strong or pertinent as that in *Flannagan's* case; so upon the whole, we conclude there was no error in rejecting it. In this connection, see, also, *Atlanta & West Point Railroad Company* v. *Newton*, 85 *Ga.* 517, and *Central Railroad Company* v. *Kent*, 87 *Ga.* 402, 408.

5. It would be a long step forward in judicial procedure if each party was required to admit every allegation in the pleadings of the other party which he was unwilling to deny upon oath, and thus relieve his adversary of the necessity of proving matters concerning which there is no real contest, and saving the courts much time, vexation and trouble. If this be so, certainly a party should be relieved from proving that which his adversary distinctly alleges. No sensible reason occurs to us why the defendant may not avail himself of all allegations in the plaintiff's declaration, without formally tendering the declaration in evidence,

or otherwise proving the admissions it contains.    The declaration being the very foundation of the plaintiff's case, he certainly should be bound by whatever he chooses to allege therein; and he can have no just reason to complain if, in the progress of the trial, his own assertions be taken as true.    Nor can we see any reason for requiring the defendant to offer the declaration in evidence.    It is usually read to the jury, or its contents are stated in their hearing, and they have it before them in their deliberations.    It is therefore available for all proper purposes, whether it be distinctly offered as evidence against the plaintiff or not.    As far back as the 9th *Georgia*, in *Peacock* v. *Terry*, page 137, the principle for which we are contending was distinctly stated in the following language:   "Facts alleged positively in a bill are constructive admissions in favor of the defendant, and need not be proven.    The complainant cannot deny them, even if they are not true, but must recover according to the case he makes upon the record."    And Judge NISBET makes the matter as clear as daylight on pages 149, 150 of the same volume. In the present case, the plaintiff's declaration alleged that her husband was running his engine at a high rate of speed, and the defendant consequently had a right to rely upon this allegation as an admitted fact, and no unfavorable inference could therefore be drawn against the company because of any failure on its part to call as witnesses its own employees to prove this fact.

6.  While a railroad company is bound to exercise ordinary diligence to recover its switch-keys from discharged employees, the mere failure to do so in a particular instance would not, *per se*, make the company liable for the consequences of a criminal misplacement of a switch by a discharged employee who had retained in his possession a key which enabled him to do the mischief.   What would be ordinary diligence in en-

deavoring to recover a switch-key from one no longer in the company's employ must necessarily vary according to the facts and circumstances surrounding each particular case. Very slight diligence would be "ordinary" in the absence of any reason to anticipate or fear that the key would be improperly used by the person who was allowed to retain it. If there was any reason to excite such fear, the company would be under greater obligations either to get back the key, or else guard all switches an interference with which was to be anticipated; and the greater the reason for apprehending such interference, the greater should be the care and diligence of the company to prevent it. No fixed and unbending rule could be laid down which would be applicable to every case. It is simply one of those things which a jury must determine in each case, in the light of its own particular and peculiar facts and circumstances. This much, however, may be regarded as well settled, viz: that in the absence of any reason other than the mere fact of his discharge from its service, a railway company is not bound to anticipate that a former employee, purely out of revenge for his discharge, will secretly commit so heinous a crime against it and the public as to maliciously misplace a switch for the purpose of wrecking a train.

In Keeley *v.* Erie Railway Company, 47 How. Pr. 256, the evidence showed conclusively that there was no negligence or want of proper care on the part of the defendant in the management of its road or in the running of its cars at the time of the accident, but was clear and convincing that the accident was caused solely by the misplacement of a switch by some evil-disposed person not connected with the road, shortly preceding the arrival of the train in the night-time, and it was accordingly held that a nonsuit was proper. This case is cited approvingly in Bishop's Non-Contract Law, §530.

We do not think a railroad company is bound, under
all circumstances and at all times, to maintain constant
vigilance to prevent all persons whatever not in its em-
ploy from having the means or opportunity of tamper-
ing with its switches or its tracks.  In Keeley's case,
*supra*, the court does not discuss the duty of the com-
pany to keep a constant and unremitting watch against
trespassers, but seems to take it for granted that usually
this would be impossible, and this we think is undoubt-
edly true.  As stated above, the only practicable way
of ascertaining whether or not, in any particular in-
stance, the company exercised the proper degree of
care in protecting its switches from interference, is to
leave the question to a jury; and in determining it,
they may, and should, look to all the surrounding cir-
cumstances to · ascertain if there was any reason for the
company to apprehend such interference, and if so,
whether, in the given instance, it used due diligence in
endeavoring to prevent the same.  In the case with
which we are now dealing, the charge of the court, in
effect, made the failure of the company to recover a
switch-key which had been suffered to remain in the
hands of a discharged employee, if ordinary diligence
had not been used by the company to get the key back,
a ground of recovery.  This charge assumed that the
mere failure to recover the key was the cause of the
injury, and was therefore erroneous.  Even granting
that such failure amounted to a breach of ordinary
diligence, it might not, of itself, have been sufficient
to authorize a recovery.  It was still a question for the
jury, and not for the court, whether the negligence of
the company, if negligent at all in failing to recover
the key, was, under the circumstances, the real cause of
the injury.

7. One ground of the motion for a new trial assigned
as error the refusal of the court to charge the following

written request: "The plaintiff is confined to the allegations of negligence made in the petition. There is no allegation of negligence respecting the company's leaving any key in the possession of any employee, and you cannot find for the plaintiff on that ground." It is true that the plaintiff did not seek to recover because of negligence on the part of defendant in improperly leaving one of its switch-keys in the custody of a discharged employee, but because of the alleged negligent misplacement of a switch which caused the death of her husband. The plaintiff proved that the switch was misplaced, and that such misplacement was the cause of the collision. The defendant sought in reply to show that the misplacement of the switch was not due to its fault, but that the mischief was done by an evil-disposed person not in its service. The plaintiff, in turn, endeavored to meet this defence by proving that the company was negligent in affording the evil-disposed person an opportunity to carry out his designs, and in not taking the proper steps to prevent their successful accomplishment. In other words, the plaintiff sought to break down the defence of the company by showing that the facts alleged and proved by it involved a breach of diligence on its part in a material respect. It is quite clear to our minds that the plaintiff had a right to urge such breach of diligence, not as a distinct basis of recovery, but for the purpose of defeating the defendant's justification, and this the plaintiff could do although she had not in her pleadings made any special reference to this particular negligence on the part of the defendant. If the charge requested had been given, it might have misled the jury and resulted in depriving the plaintiff of this right, and was therefore properly refused.

8. The motion for a new trial contained many grounds. We have ruled upon and disposed of such of the same

as bear materially upon the real merits of the case. The questions presented by those not mentioned will most probably not arise upon the next trial. According to the plaintiff's own allegations in her declaration, her husband was running his train at a high rate of speed at the time of the collision, and the undisputed evidence is, he was running it in direct violation of positive rules of the company, of which he not only had knowledge, but which he had expressly and solemnly, upon entering the service of the company, agreed to obey. The following are such extracts from the rules introduced in evidence as are pertinent:

"All trains will approach stations with great care, expecting to find the main track occupied between the station limits (switches, when no posts are up, or other point designated). The responsibility for accident between limit posts (or switches), or at fuel and water stations, will rest with approaching trains." "All trains must reduce speed and run with great care after rains and storms, while passing switches, through tunnels and crossing long bridges." "When approaching stations and sidings, enginemen must observe that switches are set right, and always look out for signals." "Conductors and enginemen will be held equally responsible for the violation of any of the rules governing the safety of their trains, and must take every precaution for the protection of their trains, even if not provided for by the rules."

The plaintiff's husband being an employee of the company, and having been guilty of negligence in bringing about the catastrophe which resulted in his death, she was not entitled, under the facts as they appear of record, to a recovery. For this reason, and because of errors committed by the court, a new trial is ordered; and if upon the next hearing the evidence is substantially the same, there should be a verdict for the defendant.                    *Judgment reversed.*