# GREAT WESTERN COAL & COKE CO. v. McMAHAN.

### No. 4460.   Opinion Filed March 3, 1914.

### Rehearing Denied September 22, 1914.

### (143 Pac. 23.)

1.  **TRIAL—Setting of Cause—Refusal to Quash.** The cause being tried on a day certain within the term (Act March 25, 1910 [Laws 1910, c. 102]), the proceedings were not coram non judice, and hence the court did not err in refusing to quash the setting of the cause.

2.  **APPEAL AND ERROR—Trial—Refusal to Direct Verdict—Evidence.** In considering whether the court erred in refusing to charge that the relation of master and servant had terminated between deceased and defendant at the time of the injury complained of, this court will, as was the duty of the trial court, lay out of the case all incompetent testimony admitted by the trial court over objection.

3.  **MASTER AND SERVANT—Existence of Relation—Sufficiency of Evidence.** Evidence examined, and held, that the relation of master and servant had not terminated between deceased and defendant at the time of the injury complained of, and hence the court did not err in refusing to so charge.

4.  **SAME—Injury to Servant—Evidence.** In an action for the death of a mine employee, evidence that deceased, for a month preceding the explosion, was habitually negligent in remaining in the mine while shots were being fired, was inadmissible to prove contributory negligence at the time of the accident.

(Syllabus by the Court.)

*Error from District Court, Latimer County;*
*W. H. Brown, Judge.*

Action by Mary McMahan against the Great Western Coal & Coke Company and others. Judgment for plaintiff, and defendant named brings error. Affirmed.

*Gordon & McInnis,* for plaintiff in error.

*H. H. Smith,* for defendant in error.

TURNER, J.   On August 26, 1910, Mary McMahan, defendant in error, in the district court of Latimer county, sued the Great Western Coal & Coke Company, plaintiff in error, and

one Thomas and one Hughes, in damages for the negligent killing of her husband, who was one of the three diggers that met death in the explosion of which we spoke in the Cunningham case against this same defendant, *ante* (143 Pac. 26). Later she dismissed her suit against said Thomas and Hughes. On October 16, 1911, she amended her petition, which, together with her amendments thereto, tendered substantially the same issues as in that case. As there, after defendant had moved the court to require plaintiff to separately state and number her causes of action, and later moved to strike, which motions were overruled, and plaintiff had amended her petition, as stated, defendant amended its answer, and made an amendment thereto, in effect as pleaded in said cause. After reply, joining issue, in effect the same as there, there was trial to a jury and verdict and judgment for plaintiff, and defendant brings the case here.

The court did not err in refusing to quash the setting. Being tried within the term (Act March 25, 1910 [Laws 1910, c. 102]), the proceedings were not *coram non judice.* As there is no merit in the contention that the court erred in overruling the motions aforesaid, and it is not contended that the petition fails to state a cause of action, or that the evidence was insufficient to take the case to the jury on the question of the master's negligence, we need only determine whether the court erred in admitting certain evidence or erred in instructing the jury as hereinafter set forth. The theory of plaintiff was that defendant was negligent in permitting McMahan to work in the mine without wetting the accumulated coal dust which had clogged the air, and in failing to inspect the mine for gas, as required by law (Rev. Laws 1910, secs. 3982, 3975), and that such failure and consequent gas and dust explosion was the proximate cause of the injury. Defendant defended on the theory that it had complied with the law by wetting the accumulated coal dust and inspecting for gas, and had furnished deceased with a reasonably safe place in which to work and that the explosion was caused by a "windy shot," igniting the coal dust produced and suspended in the air by a "follow shot"; that both were fired by the shot firers, Coffman and Boyd, and that McMahan assumed

the risk and was guilty of contributory negligence in staying in the mine contrary to orders, knowing the shots were to be fired. They also contended that in so staying after his work was done he was a trespasser, to whom they owed no duty except not to willfully injure him.

The evidence is substantially the same as in the Coffman case as to the presence of dry coal dust and gas in the mine, except that in this case it seems to be more explicit as to the former. On this point the evidence further discloses that at the time of the explosion there were seven working and five idle entries in the mine, some of which were sprinkled every four and some every eight days; but the slope was not sprinkled at all, although there was dry coal dust on it which clogged the air that night to such an extent that the rope rider riding on the second car could not keep his eyes open. In the twelfth entry east, just started, there was dry coal dust, but the same was never sprinkled. On the day before the explosion at the face of the tenth east air course there was considerable dry coal dust; also some in the tenth east entry, which was sprinkled about once a week or ten days. The eighth west entry was not sprinkled, and reaching back to a month before there was a great deal of dust in a part of it. At the face of the tenth west air course at the time of the explosion there was dry dust and in the air course. One witness said:

"There was dry dust on the slope before the explosion in pretty large quantities. When the trip went up slow, it did not stir up dust; when it went up fast, it would. * * * There was dust on the cross-timbers of the mine."

Another said:

"There was usually gas in the mine, but sometimes it was not necessary to deadline it. This continued up to the time of the explosion. * * * The mine was not inspected for gas from 4 o'clock in the afternoon until 4:30 in the morning."

Another:

"There was coal dust on the cribbings of the slope just before the explosion. * * * There was plenty of inflammable dust in the mine."

Witness complained to the pit boss about it, as did others, on two or three occasions, but to no purpose. Another was employed digging at the face of the ninth entry at the time of the explosion, and heard complaint made to the pit boss of the dust in that entry. He replied that it did not need sprinkling. The entry was dusty, as was also the slope, together with the working places of the witness.

In support of the contention that the court erred in refusing to instruct the jury, at the close of the evidence, to find in its favor, the sole point urged by defendant is that the undisputed evidence discloses the relation of master and servant had terminated between the deceased and defendant at the time of the injury, and hence defendant owed deceased no duty, except not to willfully injure him. Not so. The evidence makes no such disclosure.

In considering this assignment, it seems that we should lay out of the case the evidence, in effect, that deceased was, for a month preceding the explosion, habitually negligent in remaining in the mine while shots were being fired. This for the reason that in passing upon the question of whether he should or should not direct a verdict, as requested, it was the duty of the trial court to lay out of the case all incompetent testimony introduced over objection. *Clinton Nat. Bank v. McKennon,* 26 Okla. 835, 110 Pac. 649. While this testimony was introduced to show that deceased, as was his habit, remained in the mine on the occasion in question, and as tending to prove contributory negligence, the evidence was not admissible for any purpose. Evidence of habitual negligence as to past occurrences is inadmissible to prove contributory negligence on the particular occasion under inquiry. In *E. T. Ry. Co. v. Kane,* 92 Ga. 187, 18 S. E. 18, 22 L. R. A. 315, the principal defense was that deceased was guilty of contributory negligence in bringing about the collision in which he was killed by running his engine at too great a rate of speed, in violation of the rules of the defendant company. In support thereof, defendant offered to prove that deceased was habitually reckless in running freight trains at excessive speed, and in running too fast over switches; but the

same was excluded, and properly so, as held on appeal.   While, as there stated, the authorities on the question are in conflict, we are of opinion that its exclusion is in keeping with the better rule, for the reason that it is the character of the precise act or omission of the plaintiff in question which determines whether he is guilty of contributory negligence, and not what he did or omitted to do or was in the habit of doing on previous occasions. In other words, it mattered not how negligent deceased had been in the past, if, at the time he was killed, there was no negligence or want of care on his part which contributed to his injury. See, also, 21 Am. & Eng. Enc. Law (2d Ed.) p. 523 and cases cited.

But let that be as it may, and let us assume, for the purpose of considering this assignment, as contended, that for a month prior to the explosion this night shift, contrary to orders and unknown to defendant, had been in the habit of remaining in the mine while shots were being fired.   Pertinent to this point the evidence further discloses that on this particular night, as the last trip of coal left for the top, these men were at the face of the slope, where the shot firers were, preparing powder to fire the fatal shots; that when the last load of coal got to the top and was discharged, the engineer received a signal to return the trip empty to take out the diggers; that he did so at once, and halted it about 150 feet from the face of the slope; that without any unreasonable delay he received a signal to bring the trip out, which he at once obeyed, and, as it came about opposite the tenth entry, the explosion occurred.   It is clear from all the circumstances, the appearance of dinner buckets and lamps in the trip, and the position of the bodies when found, that all the men were coming out with all due haste when the shots and consequent explosion overtook them, and that deceased lost no time or opportunity to leave the mine after his work was finished and before the shots were fired, as found by the jury.   It is also clear, as a matter of law, that there is nothing in this testimony to show that deceased was no longer a servant of the defendant at the time he was killed.

But notwithstanding the fact that these diggers told the rope rider, at the time the last trip of coal went out, that they were not through loading, and which, according to his statement, was only fifteen minutes before the explosion, let us again assume, as urged by defendant, but which there is not a particle of evidence to sustain, that these men, after finishing their work, loitered in the mine for no purpose connected with their employment so long that the shots and consequent explosion overtook them before they could reach the top. It cannot even then be said as a conclusion of law that the relation of master and servant had terminated between the parties. In *Brydon, Widow and Her Children, Appellant, v. Stewart, Respondent,* 2 Macqueen (Scotch Appeals) 30, the facts were that on the day of the injury certain miners descended into the mine, there to remonstrate against the conduct of the mine owner, with the determination to refuse to work unless those remonstrances were attended to. They descended in safety, and as a result of the meeting resolved not to work, whereupon they made proper signals to be drawn up, and in being drawn up the accident happened which resulted from the negligence of the mine owner. One of the questions involved in the case was whether the relation of master and servant existed between the deceased and the owner of the mine at the time of the injury. Lord Chancellor Cranworth said:

"Now, my lords, in my opinion, not only is there that responsibility by the law of Scotland, but clearly also by the law of England, which is thought to be less strict on the point. A master, by the laws of both countries, is liable for accidents occasioned by his neglect towards those whom he employs. I quite adopt the argument of the solicitor general that a master is only responsible while the servant is engaged in his employment; but then we must take a great latitude in the construction of the phrase 'being engaged in his employment.' It would be a monstrous proposition, indeed, if, having sent a workman down into my mine to work for me, and he, choosing no longer to be employed there and ceasing to work, requires me to take him up again, but that the taking up should in that case be without my being liable for the same due caution for which I was liable when I let him down. That is not the meaning of the law. If, having taken him up, I afterwards dismiss him, or

if he remains in my employ, intending to go down to-morrow into the mine again, but in the interval not in the course of my employ, I am not by the law of Scotland or the law of England responsible for the accident befalling him during that interval. But whatever the man does in the course of his master's employ, according to the fair interpretation of these words, *eundo, morando, redeundo,* the master is responsible; and it does not, in my opinion, make the slightest difference that the workmen had, according to the finding of the jury, no lawful excuse or proper cause for leaving their work; that is to say, that there was not, as the jury thought, that danger in respect of the air or of the 'lining' which ought to have induced the men to say they would not work. I do not know upon that facts it was that they arrived at the conclusion about the 'lining'; but the result was that within a few minutes after commencing the ascent a man unfortunately lost his life. * * * Even if they had been employed as daily laborers, and wrongfully chose to say, 'We will not work any more,' and if without proper cause, they had said, 'We will terminate our contract, now take us up again,' it was as unquestionably the duty of the master, *qua* master, in his capacity of master, to take them up safely as to have brought them down safely. For that purpose the obligation of the master continues after they have, in truth, ceased to work in his employ, but while they were causing themselves to be removed from it. * * * The facts were that the workmen were down there; that, whether rightly or wrongly, they chose to say they would not work any longer unless some grievances that they had, or supposed that they had, should be redressed; that they directed themselves to be taken up again; and that they were accordingly taken up, and in the course of being so taken up the accident happened. In my opinion it is quite clear, by the law of England and by the law of Scotland, that the injury happened to this man from the neglect of his master, while he was sustaining the character of master towards him, and consequently the verdict ought to be entered upon the second point, and not upon the first."

See, also, *Robert D. McQueen v. Central Branch U. P. R. Co.,* 30 Kan. 689, 1 Pac. 139; *Higgins, Guard., v. Han. & St. Jos. R. Co:,* 36 Mo. 418; *Bowles v. Ind. Ry. Co.,* 27 Ind. App. 672, 62 N. E. 94, 87 Am. St. Rep. 279; *Gillshannon v. Stony Brook Ry. Co.,* 10 Cush. (Mass.) 229; *Seaver v. B. & M. R. R.,* 14 Gray (Mass.) 466; *Kansas Pac. Ry. Co. v. Salmon,* 11 Kan.

83; *Bowles v. Ind. Ry. Co.,* 27 Ind. App. 672, 62 N. E. 94, 87 Am. St. Rep. 279; *Fitzpatrick v. New Albany, etc., Ry. Co.,* 7 Ind. 436; *Ewald v. Chicago, etc., Ry. Co.,* 70 Wis. 420, 36 N. W. 12, 591, 5 Am. St. Rep. 178; *Wilson v. Banner Lbr. Co.,* 108 La. 590, 32 South. 460; Master & Servant, 26 Cyc. pp. 1086, 1087.

We are therefore of the opinion that the relation of master and servant had not terminated, and also that the court did not err in refusing to give defendant's requested instruction No. 25, which reads:

"If you find from the evidence in this case that the work of the intestate in the mine of the defendant company had been completed for the night on which the explosion occurred, and that the deceased, having completed his work, remained in the mine for no purpose connected with his employment, then none of the defendants are responsible for the injury and death of the deceased, unless such injury and death was the direct and proximate result of the wanton negligence of such defendant."

Neither did the court err in giving instructions No. 14 and No. 15, concerning assumption of risk. What we said in the Cunningham case, *ante,* 143 Pac. 26, as to these instructions is equally applicable here. See, also, *Dewey Port. Cement Co. v. Blount,* 38 Okla. 182, 132 Pac. 659. The same is true of the defendant's requested instruction No. 14. What we said in the Cunningham case concerning instruction No. 5 and refusing to give requested instruction No. 27 is equally applicable here, especially in view of the fact that Hughes, on proper cross-examination, admitted that, in the case of Maggie Boyd, *post,* 143 Pac. 36, to recover damages against this same defendant for the negligent killing of her husband, who was one of the three diggers that met death in this same explosion, defendant had expressly charged this explosion to the negligence of the deceased, who in that case was one of the shot firers that prepared and fired the fatal shots.

It is assigned that the court erred in permitting a witness to be asked, and to answer in the affirmative, that he knew the reputation among miners of the three diggers, who met death with the deceased, for being afraid to remain in the mine when

shots were fired, and then to be asked, "Q. Were they known to be afraid of shots being fired in the mine when they were in there?" and to answer, "A. Yes; they were the scaredest men I ever saw of shots." The admission of this evidence cannot be justified upon any ground that we know of. Certainly not upon the ground that it was an attempt to prove the habit of care exercised by deceased, and, as there were no eyewitnesses present, it was inadmissible to rebut any evidence of contributory negligence. This for the reason that in contemplation of law it was no such attempt, but was an attempt confined to the reputation of his three fellow workers, and had no bearing upon the habit of care exercised by deceased. But this evidence proved nothing. Certainly nothing prejudicial to defendant. To be sure, perhaps the witness, in answering the first question, qualified himself to answer as to the reputation of those three men inquired about. But he was not asked and did not testify what that reputation was, but gave his opinion only, "They were the scaredest men I ever saw of shots." This answer giving the personal opinion of the witness was immaterial and irrelevant, and not responsive to the question; but, as there was no motion to strike it out, we presume the defendant regarded the same as harmless, and so do we. There is no merit in the remaining contentions.

Finding no error in the record, the judgment is affirmed.

All the Justices concur, except WILLIAMS, J., absent and not participating.