5690.   IMPROVED FERTILIZER CO. *v.* SWIFT & CO.

1. A judgment refusing a nonsuit will not be reversed, if from an examination of the record it appears that the evidence as a whole was sufficient to support the verdict returned in favor of the plaintiff.
2. The evidence was sufficient to authorize the verdict, and there is no substantial merit in any of the assignments of error.

DECIDED JANUARY 20, 1915.

Action for damages; from city court of Eastman—Judge Neese. March 25, 1914.

Swift & Company sued the Improved Fertilizer Company for the alleged breach of two contracts for the purchase of fertilizer materials from the plaintiff. The contracts were dated respectively June 25 and June 26, 1911, and covered 300 tons of tankage and 50 tons of ground blood; of which 100 tons of tankage, to be delivered "first week in February," a like amount to be delivered "first week in March," and 25 tons of blood to be delivered "first week in March," are alone involved in the suit, since the remainder was shipped and received. The contract for the tankage (exhibit A, designated as "No. C-118") fixes a price of "$3.53½ per unit of ammonia, and 10 cents per unit of bone phosphate per ton of 2,000 pounds, c. a. f. Eastman, Ga.," and the contract for the dried blood (exhibit B, designated as "No. C-119") fixes a price of "$3.58½ per unit of ammonia, per ton of 2,000 pounds, c. a. f. Eastman, Ga." Both contracts are absolute by their terms. The petition alleges, in paragraph 4, that the plaintiff faithfully performed all its obligations under the two contracts, but that the Improved Fertilizer Company "failed and refused to accept part of the goods ordered, to wit, 200 tons of the tankage in exhibit A, and 25 tons of blood as ordered in exhibit B; that the said defendant refused to order out said goods and notified your petitioner not to ship same." Paragraph 5 alleges that the plaintiff "made the

said contracts in good faith and was prepared to fill same, but that defendant refused to comply with the said contract." Paragraph 6 alleges: "At the time said contract was to be fulfilled, the price of the tankage had fallen from the contract price, 66½ cents per unit, which at a basis of 11 units per ton makes a decrease of $7.31½ per ton. This makes the net loss on the 200 tons amount to $1,463." Paragraph 7 alleges: "At the time for the performance of the contract for the shipment of the 25 tons of blood, the price of the same had fallen 36¾ cents per unit, and, on the basis of 17 units per ton, would make a loss of $6.24¾ per ton, and the loss on the 25 tons equals $156.19." Paragraph 8 alleges, "that, by reason of the defendant refusing to carry out its said contract as aforesaid, and the falling market in the prices of the materials contracted for, . . petitioner has been injured and damaged in the sum of $1,800, or other large sum;" for which judgment is prayed.

The defendant, in its answer, admitted the allegations contained in paragraphs 1, 2, and 3 of the petition (as to the corporate existence of the defendant, and its principal office and place of business), *and also* the allegations in paragraph 4, set out above; and admitted that the allegation in paragraph 5, that the plaintiff entered into the contract in good faith was "probably true," but denied "that this defendant refused to comply with its part of the contract;" for want of information it alleged inability to admit or deny the allegations in paragraph 6; it denied the allegations in paragraph 8 (as to damages and the amount thereof), and it expressly admitted the execution of the contract and "the title thereof in the plaintiff." Three amendments to the answer were made at the term at which the case was tried, several months after the original answer was filed. The first amendment is as follows: "For want of sufficient information, defendant can neither admit nor deny the allegations contained in said 5th paragraph, but demands strict proof thereof;" and the second amendment states that "for want of sufficient information, defendant can neither admit nor deny that portion of paragraph 4 wherein it is alleged that plaintiff faithfully performed its part of the contract, and denies that portion of said petition wherein it is alleged that defendant refused to accept part of the goods offered, but, on the contrary, avers that it was ready to live up to its contract, but the goods were

never shipped out as contemplated in its said contract." The third amendment withdrew "that part of paragraph 1 of defendant's plea which admits apparently that this defendant notified the plaintiff not to ship the goods, the subject matter of this suit;" and added the statement that "under the contract between plaintiff and defendant, there was no obligation resting on this defendant to order out said goods from the plaintiff."

The plaintiff introduced in evidence those parts of the defendant's original answer in which the allegations in paragraphs 4 and 5 of the petition were admitted, and also introduced the two contracts referred to in the petition. H. H. Rogers testified, for the plaintiff, that he was manager of the Swift Fertilizer Works, and had been for fourteen and a half years, and that Swift & Company was a different corporation, but that both companies had the same officers; that Swift Fertilizer Works is engaged in the manufacture and sale of commercial fertilizers, and purchases its materials from Swift & Company and various other dealers; that the terms "c. a. f.," as used in the contract sued on, meant the cost of the goods "f. o. b. cars" at the point of shipment, plus freight thereon to destination; and that when a seller delivered goods "c. a. f.," his liability ceased when the goods were placed on board the cars; that as manager of the Swift Fertilizer Works he had dealt in the Chicago market in "blood" and "tankage," and was so dealing in the months of January, February, and March, 1912; that he was familiar with the price of blood and tankage, getting his information in regard thereto from Swift & Company, from A. A. Smith, a broker in Atlanta, and from other brokers; that in the spring of 1912 the freight from Chicago to Eastman, Ga., on blood and tankage, was $6.75 per ton of 2,000 pounds, and the rate on blood would be 40 cents per unit, and the rate on tankage 61 cents; that all blood and tankage are sold on the unit basis, there being 17 units of ammonia per ton in the blood and 11 units of ammonia and 10 units bone phosphate per ton in the tankage. He further testified that Chicago is the controlling market for blood and tankage, and that on February 3, 1912 [the first week in February], Swift Fertilizer Works purchased from Swift & Company blood at $2.81½ per unit of ammonia, at Chicago, "which c. a. f. Eastman, Ga., would be $3.21½," and that "taking these figures as the market price *(and they are the market price)*, blood had declined 37

cents per unit, or $6.29 per ton, from the time of the contracts sued on to the time of delivery under them;" and "the difference on the ·25 tons of blood which were not delivered, in contract C-119, amounted to $157.25, the same being the difference between the contract price and the market price at the time for delivery under the contract in Chicago;" that "the price of tankage had declined from the time of the contract to the time for delivery under it, and the difference on the 200 tons of tankage which were not delivered, in contract C-118, amounted to approximately $1,340—the same being the difference between the contract price and the market price at the time for delivery under the contract in Chicago, based on the values of January 30 and February 6, 1912." M. C. King testified, for the plaintiff, that he was a cotton-oil and fertilizer broker in Atlanta, Ga., and dealt in blood and tankage in 1911 and 1912, though not connected with Swift & Company; that Chicago was the recognized market for blood and tankage, and these goods had declined from the summer of 1911 to the first part of the year 1912; that he was testifying from information gathered from competitive sources and from his familiarity with the market, and that in February, 1912, blood was worth $3.117/10 per unit at Chicago, "c. a. f. Eastman, Ga.," and in the following month of March the market price was $3.02 7/10, and the freight on the same was 39.7 cents per unit, Chicago to Eastman, Ga. Julian Field testified, for the plaintiff, that he was a broker in fertilizer materials in Atlanta, Ga., and during the years 1911, 1912, and 1913 his firm bought and sold blood and tankage as brokers; that Chicago was the basis market for the goods, and there was a decline in the price thereof in the market from the summer of 1911 to the spring of 1912; that his firm bought and sold blood and tankage as brokers for the following prices: March 13, 1912, sold blood $3 per unit "c. a. f. Waverly Hall, Ga.," and $3.26 "c. a. f. Bainbridge, Ga.," and on February 29, 1912, sold tankage $2.76 per unit "c. a. f. Hartwell, Ga." George S. Ober testified, for the plaintiff, that he was a fertilizer broker in Atlanta, Ga., and the market for blood and tankage was based on Chicago; that "c. a. f." in a contract meant cost and freight added to destination, and a seller completed such a contract when he loaded and shipped the goods. He further testified that as a broker he bought and sold blood from February 21, 1912, to March 20, 1912, for $3.02½, $3, $2.97, $2.97½, and $2.95 per

unit "c. a. f. Atlanta, Ga." Also that he bought tankage on February 12, 1912, for $2.70; on February 8, 1912, for $2.75; and on February 28, 1912, $2.71—all per unit "c. a. f. Atlanta, Ga.;" and that to get the values of these goods at Chicago, there should be deducted 33 cents per unit on the blood and 51 cents per unit on the tankage.

At the conclusion of the foregoing evidence the plaintiff announced closed, and the defendant made a motion for a nonsuit, "because the plaintiff's evidence failed to show that there had been a breach of contract by the defendant, or that plaintiff had complied with its part of the contract." This motion was overruled, and the defendant filed exceptions pendente lite, and assigns error on this ground.

The defendant introduced in evidence the following letter of January 26, 1912: "Messrs. Swift & Co., Chicago. Gents: Your letter received to-day. Since you refuse to cancel our contract for the 200 tons of tankage and 25 tons of blood, we are compelled to ask you to hold up all our February shipment until the first week in March. When we receive the blood and tankage now on the road our storage room will be filled. We are having so much bad weather that crops in this section will be late starting, and furthermore we will have to have some time to make arrangements for money to take care of same, and also place to store. Thanking you in advance to grant our request, Yours very truly, Improved Fertilizer Company, Eastman, Ga., 1/26/12." D. M. Bush testified, in behalf of the defendant, that he was general manager of the defendant company, and on its part had made the contracts with the plaintiff; that a part of the blood under contract C-119, and a part of the tankage under contract C-118, had been shipped by the plaintiff and received and paid for by the defendant; and that the plaintiff never did ship the remainder of the goods called for by the contracts; that the defendant never had refused to comply with the contracts; that it had not refused to take and pay for the goods; and that if the plaintiff had shipped the goods, the defendant would have taken them; that the defendant had requested the plaintiff to cancel a portion of the contracts, but had never directed the plaintiff not to ship the goods, and had never written to the plaintiff that the defendant would not receive the goods, but had requested the plaintiff to hold up shipment for further instruc-

tions; and that this request had been made of the plaintiff because the defendant was at the time loaded up with the first shipment; that he did not know what reply he made to the telegram of April 1, 1912; that he never did tell them to ship the stuff.

The defendant then closed, and the plaintiff offered in rebuttal various letters and telegrams between the parties; from which it appeared that on December 23, 1911, the defendant requested the plaintiff to delay shipment of tankage until "second week in January, February, and March, instead of first week." On January 3, 1912, the defendant wrote to the plaintiff and stated that its "tankage contract calls for 100 tons first week in February," and requested, on account of the fact that collections were bad and money tight, that the plaintiff "hold up this shipment until 15 inst. [evidently meaning 15 prox.], so it will not reach us until the 25th inst.," and added: "We will give shipping instructions later as we need it." On January 20, the defendant wrote that on account of bad collections, etc., it was compelled to cut its tonnage "at least one-half this season," since the company did not have the money to pay for the goods, and concluded as follows: "Now, we are compelled to ask you to cancel 200 tons tankage on order C-118, and 25 tons blood on order C-119, for we just can't pay for it." On February 6 the plaintiff (referring possibly to the letter of January 20 from the defendant) wrote or wired thus: "Can not use blood and tankage. Selling freely, basis 2.95½, Eastman, Ga. Will cancel sale 200 tons tankage for 48 cents per unit, basis 11 per cent. ammonia. Wire." It does not appear from the record that any reply to this suggestion was made by wire, but on February 13 the defendant wrote to the plaintiff explaining business conditions and concluding its letter as follows: "We are compelled to cut our output this season to about half from last season's output, as we don't see any chance just now to pay for the goods, and still insist that you release us from the contract." To this letter the plaintiff replied on February 17, as follows: "Your letter 13th received. There is due you February shipment, contract 118, one hundred tons tankage; contract 119, twenty-five tons blood; contract 122, fifty tons tankage. Do you refuse to accept this material for February shipment?" On February 19 the plaintiff wrote or wired to the defendant: "Will ship 50 tons tankage to Milan, Ga. Do you refuse to accept balance of blood and tank-

age sold you for February delivery? Telegraph answer." It does not appear that the defendant replied to this until February 26, when it either wrote or wired to the plaintiff as follows: "Cotton-seed meal has advanced two twenty-five per ton. Hold our blood and tankage for our instructions, or cancel all our contracts." In reply to this last communication the plaintiff wired to the defendant, on March 2: "Answering telegram February 26, forward shipping instructions February and March quota blood and tankage. Can not cancel contract. Wire." On the same date the defendant replied: "Your telegram received. When we bought the tankage and blood, cotton was 12 and 13 cents a pound, but the big crop and the bad weather ran the price down, so our crop sold for 5 or 6 cents. We contend that we are not able to pay for it, so you had better relieve us and save trouble and expense." The next communication in the record is a telegram of March 26, from the plaintiff to the defendant, as follows: "Please wire answer our letter 18th regarding shipment tankage and blood due you." On April 1 the plaintiff wired to the defendant: "Must have immediate shipping instructions blood and tankage, if you do not accept our proposition letter of March 18. Wire." These last two telegrams evidently relate to some compromise proposition made by the plaintiff to the defendant in a letter of March 18, 1912, which does not appear in the record.

With the introduction of this correspondence the plaintiff again closed. The case was submitted to the jury, and they rendered a verdict against the defendant for $1,000. A motion for a new trial was made by the defendant, on the usual general grounds and on the following additional grounds: (1) Because the court erred in not granting a nonsuit, upon motion of defendant's counsel, made at the close of the plaintiff's evidence in chief, for the reasons, urged at the time, that the plaintiff's evidence failed to show that there had been any breach of the contract by the defendant, or that the plaintiff had complied with its obligations therein. (2) Because the following material evidence of the witness H. H. Rogers was admitted by the court, over the objection of the defendant, to wit: "As to the market price on tankage in Chicago the first week in February, I have two dates. The Swift Fertilizer Works have two contracts dated January 30 and February 6, 1912. I priced the same price 6.21½ Chicago;" this evidence being objected to on

the ground that the witness was testifying as to special contracts made on certain dates, and because there may have been some special reason moving the parties in the special contracts made, and which would not affect the price of the goods in the market. (3) Because an opinion as to what had been proved was intimated in the charge of the court to the jury, by the following statement: "Though an executory contract of purchase and sale may not be subject to countermand under its terms, except by mutual consent, still so long as it is executory on both sides, notice by the purchaser to the seller that he will not take the goods amounts to a breach of contract." It is contended that the court thereby assumed that the defendant had given notice that it would not accept the goods notwithstanding the allegation in the 2d paragraph of its original plea, expressly denying that the defendant "refused to comply with its part of the contract," and although the amendment to the plea expressly denied the allegation in the petition that the defendant refused to accept part of the goods, and the witness Bush testified that the defendant had not directed the plaintiff not to ship the goods, and had not refused to take the same. (4) Because an opinion that the defendant had refused to take and pay for the goods was intimated by the court in the following three excerpts from the charge: "If a purchaser refuses to take and pay for goods bought, the seller may retain them and recover the difference between the contract price and the market price at the time and place of delivery." "If a purchaser notifies a seller, before the delivery of the goods, that he refuses to accept them and will not accept them if delivered, this would amount to a breach of the contract of purchase and sale, and would entitle the seller to recover of the purchaser the difference, if any, in the cost price of the goods bought and the prevailing market price of the same goods at the time and place of delivery; provided the seller had been damaged by the breach of the contract on the part of the purchaser." "Though an executory contract of purchase and sale may not be subject to countermand under its terms, except by mutual consent, still, so long as it is executory on both sides, notice by the purchaser to the seller that he will not take the goods amounts to a breach of the contract."

*Clements & Girardeau,* for plaintiff in error.

*W. A. Wooten, C. W. Griffin,* contra.

WADE, J. (After stating the foregoing facts.)   Since, under the well-settled rule, a judgment refusing a nonsuit will not be reversed, if from an examination of the record it appears that the evidence as a whole was sufficient to support the verdict returned in favor of the plaintiff (*Atlantic & Birmingham Railway Co.* v. *Sumner*, 134 *Ga.* 673, 68 S. E. 593), and it has been further held that "an exception to the refusal to order a nonsuit will not be considered, where, in the motion for a new trial, which was overruled, error is assigned on the ground that the verdict is contrary to evidence and without evidence to support it" (*Duncan* v. *Redd*, 14 *Ga. App.* 306, 80 S. E. 726), it is unnecessary to consider the exceptions in this case based upon the refusal of the trial judge to order a nonsuit when the plaintiff closed its evidence in chief.  See also *Henderson* v. *Maysville Guano Co.*, ante, 69 (82 S. E. 588); *Weller* v. *Davis & Sanford Co.*, ante, 79 (82 S. E. 593), and cases there cited.

The original plea filed by the defendant admitted as true the allegations contained in the 4th paragraph of the petition, which were, in effect, that the plaintiff had faithfully performed all its obligations under the two contracts which formed the basis of the suit, and that the defendant had failed and refused to accept a portion of the goods contracted for, to wit, 200 tons of tankage and 25 tons of blood, and had refused to order out these goods and had notified the plaintiff not to ship the same; though it is also true that in the 2d paragraph of the answer the defendant denied that it had refused to comply with its part of the contract, and later, by an amendment, the admission originally made was withdrawn.  "A defendant may file inconsistent and contradictory pleas, but the plaintiff may take advantage of the contradictory nature of the defenses, and may use, as an admission against the defendant, a statement made in one of the pleas, though in another part of the defense there is set up a contradictory state of facts." *White Sewing Machine Co.* v. *Horkan*, 7 *Ga. App.* 283 (66 S. E. 811).  Even "an admission contained in an answer of the defendant filed by him in another case is admissible in evidence against him when pertinent to an issue involved in the case on trial." *Sons and Daughters of Job* v. *Wilson*, 4 *Ga. App.* 235 (61 S. E. 134); *Watkins* v. *Fontaine*, 14 *Ga. App.* 321 (80 S. E. 694).  Even the admissions in a bill in equity, filed only by counsel and not sworn

to by the complainant, may be given in evidence. *Lamar* v. *Pearre,* 90 *Ga.* 377 (17 S. E. 92). "Admissions of fact in a pleading can always be taken advantage of by the opposite party, even though the pleadings should be stricken or withdrawn." *McElmurray* v. *Blodgett,* 120 *Ga.* 9, 16 (47 S. E. 531), and cases there cited. "This rule, however, has no application where the admission is simply an opinion on the part of the party making it as to the legal effect of a paper." Id. If admissions are made, they are to be taken as true "because they are asserted by the party himself; and while he may withdraw them formally from the pleadings, he can not by a mere withdrawal avoid the effect of the admissions made." *Cooley* v. *Abbey,* 111 *Ga.* 439, 443 (36 S. E. 786). See also *Lydia Pinkham Medicine Co.* v. *Gibbs,* 108 *Ga.* 138 (33 S. E. 945). It has been held that "the defendant may invoke and use allegations beneficial to himself made in plaintiff's declaration, without offering the declaration itself in evidence or otherwise proving the admissions contained in such allegations" (*East Tenn. Railway Co.* v. *Kane,* 92 *Ga.* 187 (5) (18 S. E. 18, 22 L. R. A. 315), and of course it is equally true that the plaintiff can use admissions made in the defendant's answer in the same case without actually offering the answer itself in evidence. In the case now before us the admissions in the answer (which had been previously withdrawn) *were* formally placed in evidence. Under the present law as to pleading, any averment distinctly and plainly made in the plaintiff's petition, which is not denied by the defendant's answer, shall be taken as prima facie true, unless the defendant states in his answer that he can neither admit nor deny such averment, because of the want of sufficient information. Civil Code, § 5539. Also, under a statute now existing (Civil Code, § 5775), "without offering the same in evidence, either party may avail himself of allegations or admissions made in the pleadings of the other." Admissions of this character are only prima facie true, however, and may be withdrawn and the contrary shown by proof. But the jury undoubtedly may elect to believe the admissions originally made in a plea, even after the admissions have been formally withdrawn, where tendered in evidence and supported by other proof, as in this case, notwithstanding evidence to the contrary in behalf of the defendant. It appears, therefore, that under the general grounds of the motion for a new trial, the question for solution is whether the en-

tire evidence in behalf of the plaintiff, with the admissions made in the original plea of the defendant and placed in evidence after having been withdrawn, would authorize the verdict returned by the jury.

We have set out practically the entire evidence, and from an examination thereof it may be said generally that some of the communications from the defendant to the plaintiff might be interpreted as merely a request for the cancellation of the two contracts upon which the suit was based; or on the other hand, they might be construed, in connection with the related circumstances, and especially when taken in connection with the admission made in the original plea, as a cancellation on the part of the defendant. In other words, whether there was or was not a cancellation intended by the defendant company and communicated to the plaintiff was a question of evidence entirely for determination by the jury; and, notwithstanding the express assertion on the part of Bush, the manager of the defendant company, that the company never refused to comply with the contract and did not refuse to take and pay for the goods, the jury could have reached a different conclusion, not only from the admission in the original plea, but from the language employed in several of the letters and telegrams, the substance of which has been given, and also from the fact that the plaintiff was unable to obtain a definite response from the defendant to numerous communications asking in effect or in so many words the direct question whether or not the defendant proposed to accept the goods, and requesting shipping instructions. It will be observed that the plaintiff wired the defendant, even as late as March 26, and again on April 1, 1912, in regard to the blood and tankage; and, so far as the record discloses, though these communications would seem to demand an answer, absolutely no response was elicited from the defendant. Previous letters, as will appear from the statement of facts, equally urgent and equally requiring an answer, appear also to have been quietly ignored. "Acquiescence. or silence, when the circumstances require an answer or denial or other conduct, may amount to an admission." Civil Code, § 5782. "In the ordinary course of business, when good faith requires an answer, it is the duty of a party receiving a letter from the other to answer within a reasonable time. Otherwise he is presumed to admit the propriety of the acts mentioned in the letter of his corre-

spondent, and to adopt them." Civil Code, § 5741. That "silence gives consent" has become axiomatic. The jury may have considered the failure on the part of the defendant to reply frankly and candidly to the question propounded by the plaintiff in their letter or telegram of February 17, 1912 ("Do you refuse to accept this material for February shipment?"), and the question propounded in the telegram or letter from plaintiff on February 19 ("Do you refuse to accept balance of blood and tankage sold you for February delivery?"), to have been in effect an answer in the affirmative, since good faith and business candor would alike seem to demand an explicit reply. Especially would this conclusion be warranted when it is considered that prior to the date of these telegrams or letters which apparently remained unanswered, the defendant had stated to the plaintiff, on January 20, that it was compelled to ask for a cancellation of the two contracts and could not pay for the goods, and, on February 13, that it did not see any chance just now to pay for the goods, and still "insisted on a release" from the contracts; and on March 2 stated to the plaintiff that it would be impossible to pay for the goods, and advised that "you had better release us and save trouble and expense." Then too, the jury might have taken into consideration the fact that the original admission made by the defendant, that the contract had been canceled and it had refused to accept the goods, was not withdrawn until several months thereafter, at the actual trial of the case, and not then until after two other amendments had been offered and allowed by the court. Otherwise it is not contended, except in the general terms of the original grounds of the motion for the new trial, that the evidence as a whole was not sufficient to warrant the verdict. The market value of the goods purchased appears definitely to have been shown on the date fixed by the contracts, and the contracts themselves state the price to be paid, and the measure of damages can easily be arrived at. The jury passed on all the questions of fact coming legitimately within their province, and, since there was evidence sufficient to support the verdict, we may not disturb their finding, unless for some of the special assignments of error set out in the motion, which we will briefly discuss in their proper order.

The assignment of error as to the refusal of the court to grant a nonsuit has in effect been already discussed. The second special

ground of the motion for a new trial assigns error because the court allowed the witness Rogers to testify, as set out in the statement of facts, what the market price of tankage in Chicago was in the first week of February, based on two contracts made by the Swift Fertilizer Works on January 30 and February 6. The evidence set out in this ground, certified to by the court, does not appear in the identical words of the brief of evidence itself. Taking the testimony complained of, in connection with the entire evidence of this witness, it will be seen that his testimony as to the market price of blood and tankage does not appear to have been based exclusively on any special contracts of the Swift Fertilizer Works. The witness said that on February 3, 1912, the Swift Fertilizer Works purchased from Swift & Company blood at 2.81½ per unit of ammonia at Chicago, which "c. a. f. Eastman, Ga. would be 3.21½," and that, "taking these figures as the market price (and they are the market price), blood had declined 37 cents per unit, or $6.29 per ton from the time of the contracts sued on to the time for delivery under them;" and that "the difference on the 25 tons of blood which were not delivered, in contract C-119, amounted to $157.25, the same being the difference between the contract price and the market price at the time for delivery under the contract in Chicago." Also, this witness testified that the price of tankage had declined from the time of the contract therefor to the time for delivery thereunder, and the difference on the 200 tons of tankage not delivered, in contract C-118, amounted to approximately $1,340, "the same being the difference between the contract price and the market price at the time for delivery under the contract in Chicago, based on the values of January 30 and February 6." It may be that the witness based his statement as to the market price of blood and tankage during the first week in February on two dates only, but, taking the evidence altogether, it does not necessarily appear that his statement as to market values was based exclusively on the contracts made between the Swift Fertilizer Works and Swift & Company. Besides, no material harm could have resulted to the defendant, even had the testimony of Rogers as to the market value of blood and tankage during the first week in February, 1912, been based entirely on the price paid by the Swift Fertilizer Works on two or more special contracts, since the defendant did not undertake to dispute the testimony intro-

duced by the plaintiff as to the market values of blood and tankage, and these values were shown with sufficient clearness and certainty by other testimony from King, Field, and Ober, which was by itself amply sufficient to support and authorize the verdict returned by the jury. .

We think that the instructions complained of in the 3d and 4th special grounds of the motion for a new trial contained no intimation of opinion that the defendant had refused to comply with its part of the contract, and had refused to take and pay for the goods bought, and had thereby made a breach of the contract, as is insisted by the plaintiff in error. The judge undertook therein merely to define to the jury an "executory contract," and instruct them as to what would amount to a breach thereof, and to inform them what would be the proper measure of damages "if a purchaser refuses to take and pay for goods bought" and notifies the plaintiff before shipment that the goods will not be accepted, etc. The charge was adapted to the issues raised by the pleadings and the evidence, and it appears to us to have been fair and impartial and not subject to the criticism made thereof.

The assignments of error are without substantial merit, and, the evidence being sufficient to warrant the verdict, the judgment overruling the motion for a new trial is

> *Affirmed. Broyles, J., not presiding.*